May it please the Court, in Raisley-Sanderson Plumbing Products, the United States Plumbing States Supreme Court quoted Anderson v. Liberty Lobby 477 U.S. 242 at 265, the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Had that basic proposition been followed in this case, summary judgment never would have been granted on either the discrimination claim or the retaliation claim in this case. As to the discrimination claim, the most basic fact from which a jury could have inferred if it were allowed to do its function that race discrimination was the reason Ms. Harville was laid off was that the city clerk, both in the minutes and in the executive session minutes of September 15, 2015, the date of the layoff, told the board unequivocally that Mrs. Harville is the person whom I need in the clerk's office because only she can do the vital function of the taxes. That's 544 and 318, both the minutes in executive session and the regular minutes. Mr. Wade, let me ask you a question. As I read this record, it looked to me like there was a strong suggestion in the record anyway that this decision was based not on race but nepotism. Yes, sir. I agree with that, but that would be a jury function to decide that, Your Honor. I'd also like to point out to the court. That's really kind of a friendly question, I guess. But when it comes down to the last poem, the three-step sequence that we required, and the plaintiff, when the defendant has articulated a nondiscriminatory reason, and then it's up to the plaintiff then to at least make a case, raise a fact question at least as a pretext. I'm trying to narrow the focus of where the fact issue is going to be. In other words, the jury would, that there's some kind of, they articulate a, how would you apply the third step in this case? Well, their articulated reason was that she was least needed because it was seasonal. But they had the clerk, the very person who's in the office. If we'd been able to cross-examine weaknesses, how in the world does this alderman know, unless maybe Ms. Jones, whose cousin and sister is there, how does he know who does what when? But the clerk who's there doing it says, Ms. Horrible, that this function is a year-round function, and she goes into detail about why. And so the jury would have to infer, do they in good faith believe that Ms. Horrible's not best, or is this just a pretext for pleasing Ms. Jones, the alderman? I want to bring a court's attention regarding that comment about nepotism. The first case the defendants cite on that nepotism issue saying, well, the jury should have found it was nepotism, not race, is this Holder case. It's 867 F. 2nd and 827. It's a Fourth Circuit case. But what that case says, what it actually says is that nepotism can go into the equation in determining whether race discrimination is the reason. The presence of family preferences is a factor, might be considered to be a factor in their promotion, and might be evidence upon which the inference of invidious motive may be drawn. I explained why in my brief. Obviously, if it's a black person and a black sister, it's going to be more likely that Supreme Court decision in the Pullman case that said that, that talked about that issue. This is not to say that discriminatory impact is not part of the evidence to be considered by the trial court in reaching a finding on whether there was a discriminatory intent. In other words, according to Holder, that's just part of the equation from which the jury could infer race discrimination. It's not per se. That is, proven nepotism is not a per se violation, but it is evidence from which a jury could utilize in inferring race discrimination. It's a common sense notion that if it's somebody's sister, she's more likely to be black. So, just to go over. So, the pretext is that it was because of seasonal, but the decision makers heard contemporaneously that she wasn't seasonal. Exactly right, Your Honor. And she's the person at a position to know. And then you have some evidence that she's the better worker to keep because that's why the clerk says that she's the one she needs. Yeah, well, you have a lot of evidence. The clerk says it, and then after they had to hire somebody to come in and do the taxes because they didn't have anybody to do it. The clerk told them that she couldn't do it herself, and they had to hire a person from the county to come in to help with the taxes after. You know, the clerk told them that, and then they found it out. There's evidence in the record, Your Honor, that Ms. Jones, they make a big deal out of, well, the whites voted that way. Well, Ms. Jones, if you look at the record on page 318, the very last sentence of the record, the clerk is there, I mean, the very last sentence of the minutes, the clerk has explained to them how she's needed and nobody else can do it. And then the black alderman, Ms. Jones, stated that Barbara, that's actually the black alderman's sister, trained Paula and knew how to do the job. That's what the black alderman said, well, my sister trained her and she knows how to do the job. That's the last sentence in the minutes on page 318 of those September 15 minutes. So, obviously, she's influencing the other aldermen. And the jury could find, Your Honor, that she was racially prejudiced or that she, I'd say there's evidence from which the jury could find that Ms. Jones held a race against her because on page 451 of the record, Ms. Horrible talks, she's asking how did she get along with all the aldermen, and she says, well, fine, except Ms. Jones was getting on to me several times because I wouldn't give her a refund back that the clerk told me I couldn't give her. She'd paid somebody else's taxes and she wanted her money back. And the clerk told Ms. Horrible, you can't give her her money back. That's not something you can do. And she wouldn't do it. So a jury might think, well, that was a race issue. She's making unjustified complaints. They won't leave her alone. And Ms. Horrible also said she had a problem with her, with Ms. Buggs, because she was always going to her sister, the alderman, about what was going on in the office. So what to infer from all that, you know, that could be personal or it could be racial. The board was unanimous? Yes, sir, but here's something that diminishes the effect of that.  Five, Your Honor. And only, you're talking about one board member right now, right? It's the Jones? The Jones, yes. As to the other board members, any evidence that they were operating based on race? No, sir. Any evidence that, I think you've alluded to one, but what is your evidence, then, that they were affected by Jones? They were sort of operating? Well, because I'm looking at the minutes, Your Honor, and the minute says Ms. Jones, the jury has to decide whether to affect her or not, but Ms. Jones is the one that takes up and says the clerk's not right, Ms. Harwell is not the only one that can do it. I see your point that there's record evidence during this debate that Alderman Jones, Member Jones, is advocating for her sister. She's advocating, yes. Is there any evidence beyond that? Yes, sir. Hold on, I haven't asked my question. I'm sorry, Your Honor. That's all right, that's all right. But I just want to ask my question, because you may not know what it is. Any evidence that the other members were actually persuaded by Jones? Well, I guess the evidence of the vote, they all voted against her. I'm just asking. So it's just, what you have is Jones speaking out. Jones spoke out. And then the subsequent vote. There's nothing beyond that. But I don't know how you could have anything beyond that, Your Honor. She spoke out. Well, there could be a discussion. I mean, theoretically, there could be more evidence. I'm just asking what we have. Except for direct evidence, there wouldn't be any way to prove anything like that. We know they voted against her, and we know Jones. My point is, we're now speculating as to why. Absolutely not speculating, Your Honor. Absolutely not speculating. We're drawing reasonable inferences. Reasonable inferences is that Ms. Jones is there saying that you're not telling us right about Ms. Horrible. The jury could reasonably infer that's race-based, especially since Ms. Jones and Ms. Horrible have had this difficulty in the office that the jury may infer was baseless on the part of the Alderman. Just to be clear, then, your theory is you have sufficient evidence by the fact of you have the statement from Jones, and then you have the subsequent vote. Those two things are enough to get to the jury. Yes, Your Honor. I think I understood your question. I have trouble hearing, but I think I understood your question. I apologize. I'm happy to ask again. The evidence that the board was tainted, cat's paw type theory, is that Jones spoke out, and then you had a subsequent vote. And your theory is that's enough. You don't need anything more than that. The other thing was that there was evidence that there was some hostility between Jones and Ms. Horrible. Some hostility. That's on page 451. Fair enough, but that has nothing to do with the other board members. Yes, sir, that has to do with it because this earlier hostility had existed. By other board members or just by Jones? What had happened, Your Honor, was that Alderman Jones and Horrible had had this disagreement over whether Horrible should refund taxes to Jones. A jury could find there was no reasonable basis for the alderman getting on to Horrible about that or disagreeing with her because the clerk had told Horrible not to give her a refund. I mean, whether that was just personal animosity or whether it's right is a jury question. I'm spotting you that Jones is against your client. My question is Jones is not the independent. Jones can't act alone. Jones needs the board. Right. And so your evidence that the board basically did Jones' bidding is the fact that Jones spoke and then ---- It's not rational, Your Honor, to hire the one employee you need. You've got a white employee you need. You've got a black employee you don't need. There was a debate about this. Sir? There was a debate. There wasn't a reasonable debate about that. I mean, to me, the jury has to decide whether it's reasonable or not. Because it's your point that the Jones did not ---- what Jones said in support of her sister was not true. Is that ---- It turned out not to be true because the clerk testified that, in fact, her sister couldn't do the job. She tried to let her do it, and she couldn't do it after the fact. So Jones said this person can do the job at least as well because she trained the other person. That's exactly right, Your Honor. And she couldn't do the job. Are there some evidence that she couldn't or that the other woman was better at the job, Ms. Harville or whatever? And then what about the seasonal? Did the alderman also make the seasonal argument? Here's what happened. One alderman, when you look at these minutes on page 318, one alderman said it's a seasonal job. A jury has to infer where did he get that. He doesn't work in the clerk's office. He might have got it from Alderman Jones, whose sister works there. A different alderman said seasonal. Yes, ma'am. A white alderman. A white alderman said it's seasonal. And then the clerk said, no, it's not seasonal. This is a year-round type of job, and the clerk would be in the position to know. It's up to the jury, Your Honor, to decide which one's telling the truth. What he says is, well, in good faith they believed it. Well, that's a question for the jury when you've got the clerk there telling them, no, it's not true. That's a question for the jury. Your Honor, on the retaliation, I'm afraid I'm going to lose my time to talk about retaliation if I don't go on, Your Honor, in all deference. On the retaliation claim, Your Honor, it's a—I want to refer the court to page 583. That's the minutes, the May minutes. They started advertising for this. The clerk quit, as you ought to know. The clerk quits later, and they had to fill the position. The clerk quits about six months later, and they started advertising it in March. In April, they started advertising for the position. Those advertisements are in the record. And they have a board meeting. They've advertised it in March and April, and they have a whole bunch of applications, I believe. In April, they had 13 applications. Ms. Harwell applied for the job every time they advertised it. On page 5—it looks like 562. I'm misreading my writing, but it's the May meetings. It's 562, and it's the May board meeting. Oh, I'm sorry, Your Honor. That was in response. Earlier, Your Honor asked about whether all whites voted for it. Actually, what happened was there was just a joint vote on four positions they were filling. There wasn't a separate vote to this position. There was four votes. That's on page—I mean, there's a vote on four positions. That's 562. But what I wanted to point out to the court was in May, when they're talking about filling the position, we know we've got all these applications. But in the board minutes in May—and that is 583, the board minutes in May—and they've got all these applications, and nobody says a thing in the world about the fact that we've got this lady that was here 10 years that's got a pending EEOC charge. Instead, here's what happens. Mayor Parker states that it is the consensus of the board that the clerk's office should be re-advertised. In other words, a jury could draw the inference, if they have some reason for not hiring Ms. Harwell, why don't they state it in the minutes? Why is it that we have the mayor stating it's the consensus of the board the job should be re-advertised? All these applications are there, including Ms. Harwell, but they don't—they never mention Ms. Harwell. This is in May. In fact, we just filed the suit in April, the month before, and they never in the minutes ever mention Ms. Harwell. We've got the lady that the clerk says ought to have the job. She's highly qualified, and for some reason, they never mention her. They just say we're going to re-advertise the position. So they go through March, May, August. In August, when they did the August advertisement, Ms. Harwell was the only one that applied, and they still don't hire her, and they never put anything in the minutes. They never mention her. So the inference is, Your Honor, from—the jury could draw the inference that the reason they weren't hiring her is because she filed the EEOC charge. My time's up, but one further thing. The last time they made the hiring actually in November, the last EEOC charge was actually filed October the 11th. That's page 162, when she's complaining about you won't even interview me or hire me. She filed an EEOC charge about that in September, record 338, in October, record 162, and then in November is when they hired the CPA. Thank you, Your Honor. My time's up. Thank you, counsel. Good morning, Your Honors. May it please the Court. The majority white board for the city of Houston, Mississippi, did not eliminate the plaintiff's deputy city clerk position because the plaintiff, too, is white. Nor did that same board hire a more qualified candidate for the higher position of city clerk because the plaintiff had made meritless allegations of race and age discrimination after the city had already determined that they would eliminate her deputy city clerk. What was the first point? That the majority white board for the city of Houston, Mississippi, did not eliminate the plaintiff's deputy city clerk position because the plaintiff, too, is white. Are you arguing that people can't discriminate if they're of the same race? I'm sorry, what is the point of that? There is a same race inference, Your Honor. This Court has always said that it would be the rare case. You shouldn't lightly infer the fact that people of the same race would discriminate against their own race. Judge Aycock's summary judgment should be affirmed in its entirety. The starting point here is that the two challenged employment decisions were made by a multi-member board. In that situation, the plaintiff has the burden of proving that the collective decision-making of the board was tainted by unlawful animus. The plaintiff hasn't met that burden here. Instead, she focuses on a single member of the board of aldermen, Sheena Jones, who is related to two of the deputy city clerks whose positions were not eliminated. There are several problems with the plaintiff's attack on Alderwoman Jones. First, Jones was actually the board member who made the motion to hire the plaintiff when she originally came to the city. That triggers the same actor inference, which dilutes any suggestion that Jones had anything against the plaintiff because she's white. Second, as Judge Higginbotham pointed out, courts have often said that it's inappropriate to equate what might be suggestive of nepotism to racism. But that's a fact issue, isn't it? It's not, Your Honor. The plaintiff herself on page 190 of the record concedes that she has no reason to believe that Jones had anything against her because she's white. She concedes that point. Do you have a case that says that if it could be nepotism or it could be racism that we can decide that as a matter of law? Your Honor, there's no case out of the Fifth Circuit that says that. Is there a case in any court that says that? Judge Acock cited a string of sites from other circuits. It says if it could be one or the other, we can choose which one to believe it is? Well, I think that the point is that nepotism is not racism. There has to be other evidence that suggests that there be racism. It's not enough that these people alone may be related. But the more important point is that the plaintiff herself concedes on page 190 of the record that she has no reason to believe that Jones has anything against her because of her race. But the most important point of all is that even if the plaintiff could impute some sort of discriminatory animus on Jones, it would be entirely irrelevant in the context of this case because she was one of five board members who unanimously voted to eliminate the plaintiff's position. So it had no impact. Now, we talked about the collective decision-making doctrine in our brief, and for the very first time in the reply brief, the plaintiff started talking about catchpaw. That argument comes way too late. The city, of course, did not have a chance to address it because of the way it was invoked in this case. But even if this court were to entertain that argument, it still couldn't carry the plaintiff where she ultimately has to go because there's no evidence that she exerted any influence over the other board members. How did Tony Uherin opine that Harville's job was seasonal, and where did he get that idea? The plaintiff herself admits that these tax notices logically go out one time per year around Thanksgiving. So it was certainly reasonable for him to say— Or maybe he just came up with that on his own. I think this was a broader discussion, Your Honor, because they were considering four different positions about which one they would eliminate. And it's certainly reasonable to say this particular lady's primary job responsibilities are more seasonal in nature than the other three deputy clerks when everyone knows that it's undisputed. These tax notices go out one time per year. And the fact that this particular white alderman led the charge to eliminate the plaintiff's position cuts against any suggestion that she influenced the other board members. In fact, he was the one that led the charge. So even if the plaintiff had not waived or abandoned the cat's paw theory, which she has, it still just doesn't apply in this particular case. Do you agree that the district court did err in articulating an incorrect standard in its ruling? In what regard, Your Honor? I do not agree with that. When the district court relied on a pre-Reeves case to say the existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification. Your Honor, I think the bigger point here is that there's just— So do you— I'm not exactly familiar with that— That's not the state of the law, is it? Well, I'm happy to talk about Reeves, Your Honor, which, again, the whole point of Reeves is that if you can make out a prima facie case and if you have evidence to suggest that the plaintiff's evidence is false, then you may, but not always— You go on. You don't have to have then something else on top of it automatically anymore. Well, I think even Reeves says that there can be cases where— There can be, but that's not the general rule. That's not the general rule, of course, Your Honor, of course. But one other footnote point on this cat's paw theory that I think is important. You've got to keep in mind that the race claim was brought under both Title VII and Section 1981, the latter of which, of course, has to flow through 1983 because we have a municipal defendant. There's a large body of case law that says municipal liability can't be premised on a cat's paw theory because it would violate the rule that you can't have vicarious or respondent superior liability in the 1983 context. Have we opined on that? You haven't, Your Honor, and there's no reason for you to opine on it in this particular case. But I just make it for the point to highlight that there's all these issues surrounding the cat's paw theory that nobody has ever addressed because of the way that the plaintiff interjected it into this particular case. But it is important that we get the correct standard. I think we were reversed in Reeves. Right. It was a Fifth Circuit case, Your Honor. It was. Again, this court has always said that there's a higher standard for plaintiffs to overcome when you have a rift case like this one. You add on top of that to the fact that we're talking about a collective decision-making, the multi-member board, and the plaintiff just has not met her burden. And, again, the reason that the plaintiff has not been able to pierce this collective decision-making of the board is because the proffered reason by the city is just so strong. What about the retaliation? Turning to the retaliation claim, the district court granted summary judgment correctly on that claim as well. And I think it's just from the gate it's important to point out the type of litigation strategy that these particular claims are built on because you see it all the time in employment cases. You have an employee who's laid off. They didn't file an EEOC charge. They then apply for a completely different job for the employer, and when they're not hired, they tack on a retaliation claim to this already pending lawsuit. But meritless allegations of discrimination should not be a springboard for meritless claims of retaliation. Under the Supreme Court's decision in Nassar, the causation standard is even higher in the retaliation context than it is in the discrimination context. It's also a case reversing the Fifth Circuit. Right, which is beneficial to me in this particular regard. Yes, exactly. The plaintiff's causation evidence here likely is not enough to even meet a prima facie burden, much less the ultimate but-for causation standard. And, again, the reason that the plaintiff is not hired is paramount. The plaintiff can't pierce, again, the collective decision-making of the board because Ms. Sanford's qualifications are so much superior than those of the plaintiff's. Do we automatically look at those qualifications, though? Because I thought her point is that it happened earlier when they reopened the whole thing. Well, I think that you have— Because he wasn't in the—Sanford wasn't in the first set, right? That's right, Your Honor. But I think that you have to look at the reason for the adverse action is the test, and the reason is the qualifications. And Ms. Sanford, you have to keep in mind she had an accounting degree. She had 30 years of accounting experience. She was in the process of getting her CPA, and she worked for another municipality. The plaintiff, by contrast, did not have a college degree at all, and she had far less relevant experience. So not only was Ms. Sanford—or not only was the plaintiff not clearly better qualified than Ms. Sanford, Ms. Sanford was clearly better qualified than the plaintiff. And this Court, under the clearly better qualified standard, has always said that that's a— And we automatically have to look at that, even though I think—she says the discriminatory action was earlier. Right. I think so, Your Honor, because I think that the point is— I don't—we cite some cases in our brief, but I think those cases are more to the point that a request to be interviewed and not being interviewed is not an adverse employment action. And it's my understanding under Reeves, Step 3, you've got to focus on why the decision was made. And any time you have a situation like this one where you have two comparative candidates, the clearly better qualified standard is triggered. That's also important, not to backtrack, but that is important in the discrimination claim as well, because the plaintiff's theory of that case is not that—the plaintiff's theory of the case there is not that the city did not have these budget problems. That's undisputed. They did. The plaintiff's theory is basically I should have been kept rather than Deputy Clerk Jones. Any time that is the argument, this Court has said there's a two-step process that you have to evaluate that argument. One, the plaintiff has to show that the two positions are similarly situated. And even if you can show that they're similarly situated, then the plaintiff has to show that she's clearly better qualified again than the person whose job position was not eliminated. The person hired was better qualified? Is that your argument? Pardon? You said that they just chose the better qualified person? For purposes of the retaliation claim, the clerk position, right. For the retaliation. But that same argument applies to the plaintiff's argument about— What about the budgetary constraints? What about the budgetary arguments that were articulated in the original decision of the Board? You said there were two reasons the Board said, and one of them was budgetary, and the other was seasonal. Well, there's a fact issue on the seasonal. And the budgetary interest, then you turn around and hire somebody with a CPA who's much better qualified. That doesn't sound like the budget restraint is operating there. No, Your Honor. I want to make sure I'm clear on this point. We're talking about a town with approximately 3,500 people. It's certainly reasonable for the city who is experiencing these significant, undisputed budget problems to say, We've got too many deputy city clerks, so we're going to eliminate one of them. They do that job elimination. And again, there's a two-step test that applies to that. OK, months later, fast forward to March. In March, the city clerk, a completely different position, resigns. And then for an eight-month period, the mayor steps in and begins performing these job functions of the city clerk. So what you have going on during this time is the city is receiving a savings by not having to pay the city clerk position. And then at the same time, they're trying to figure out what they're ultimately going to do with this position. And there were all these different ideas that were floated over that eight-month period. There were conversations about not having a city clerk at all. There were conversations about hiring an outside consultant. There were conversations about maybe getting someone on a part-time basis. And this is documented in the record because we have a situation where the media would show up at these board meetings, and there's newspaper articles in the records. So these things are clearly documented that you have these ongoing discussions about how to best juggle the duties and juggle the budget concerns. There was a lot of discussion about, well, why didn't you follow the recommendation of the city clerk? So I want to discuss that. You know, just as an initial matter, the clerk is the individual responsible for making the budget for the city. The board was in the middle of a budget shortfall because of the budget that the clerk made. So it's not suspicious that they were not listening to her recommendations. But more importantly, the city clerk at the time, it was not like she said. She was trying to save all of her clerk's jobs. It was not like she was saying this is some terrible employee. Her actual rationale for why she would have chosen Deputy Clerk Jones over the plaintiff was because Deputy Clerk Jones had been out on pregnancy leave and the board had been fine without her. So it certainly was reasonable for the board to say, well, we're not going to punish this lady as the clerk is suggesting because she's been out on pregnancy leave. Doesn't the evidence show she couldn't do the job because they had to also hire another deputy clerk to do that job? That's not accurate, Your Honor. I thought you heard that. He did, and I'm happy to clarify. They did not hire somebody to come in to consistently perform these jobs. In August of 2016, they got someone from the county tax assessor's office to help them on a one-time basis. They dispersed these remaining duties of the city of the plaintiff over these other deputy clerks. That was a one-time thing in August of 2016, and that's in the record. That's not accurate that they hired somebody else to come in and fulfill her duties. It wouldn't be relevant anyway because it happened after the decision was made. You don't think it could be some evidence of whether which one was better at doing the job? I don't know that you can consider an after the fact. So I think that's a closer question, but I don't think it matters here because the record citation is not accurate. It was a one-time engagement of somebody from the tax assessor's office in August of 2016. Okay. What about all this stuff with the person being allegedly pressured by NAACP coming to the meeting? Can you help us with that? Happy to, Your Honor. The plaintiff, during her deposition, she said they didn't choose the black deputy city clerk because they were afraid that the NAACP would come to town. When pressed on that, she was forced to admit she had no reason to believe that. That was entirely speculation. The city clerk, Futrell, when she resigned in March of 2016, the plaintiff's brief calls it she resigned amidst racial animus. Well, the allegation was that the clerk herself was racial profiling, and she didn't want to deal with the allegations, and that's why she resigned. There were no allegations that the city was responsible. So there were some racial things going on in the clerk's office? That's what the city, Futrell, had said someone had accused her of racial profiling. But, again, the city then hires a white deputy city clerk ultimately to replace her. There's just no evidence in this case that the collective decision-making of the board was tainted by any racial animus. Again, I think it's important. We've got a RIF case. We've got a multi-member board. And the plaintiff's primary argument is that someone else should have been chosen over me. You've got to apply the two-step process. One good case on that is Judge Smith's decision in Ballmaster v. AIG, and it says you've got to show they're similarly situated, which I'm not even clear that the plaintiff can do that here because her whole argument is my job duties were more important than the lady who was not chosen for the RIF, and under this court's nearly identical standard, I view that as a concession that they're not similarly situated. But even if you could get similarly situated, we explain on page 16 of our brief, a comparison of these two individuals' qualifications, why the plaintiff cannot overcome the high, clearly better-qualified standard. Again, Jones had a college degree, and she performed duties, water and sewage, that were performed on a monthly basis that the city certainly had a right to view as more important than seasonal tax duties, which, again, is conceded. These tax notices go out one time per year. Just getting to first principles here, this court has always said that the employment discrimination statutes were not enacted to prevent unfair decision-making or even arbitrary decision-making. They're only in place to prevent intentional discrimination on the basis of race or intentional discrimination because of retaliation. Judge Acock correctly found in this case that neither type of evidence was sufficiently and appropriately granted summary judgment. Again, to reverse Judge Acock's decision, this court would literally have to write an opinion to say that the board's decision-making was not reasonable. The question is not, again, whether it was unfair, whether this court or the plaintiff would have done it differently. There's many ideas that can be floated here, but under state law, the board is the one charged with that responsibility. They came to completely reasonable decisions in a tough situation, which everybody concedes. They were experiencing an extreme budget shortfall, and their actions were certainly reasonable. Judge Acock or Judge Elrod, one good opinion from this court is the Reed v. Neopost opinion that you wrote about the objective reasonable standard and how that is applied as a matter of law. So we would ask that Judge Acock's decision be affirmed. Thank you. Thank you. Your Honor, counsel made a very interesting comment when he said that they had evidence, so it's uncontradicted, that before they filled this clerk's position, all kinds of ideas were being floated around about why they shouldn't fill it. He is absolutely right. There were. They came up in the minutes to reflect this. Everything in the world that you could think of as to why not to fill the clerk's position. And the problem is, and this is the whole Seventh Amendment issue to me, the whole problem is the jury was entitled to infer that. The reason was they didn't want to give it to Ms. Harbert. She'd been there for 10 years. They'd been repeatedly advertising it since March. She'd applied for it every time, March, April, May, until they came down to August when she was the only application, and they still wouldn't fend it, still wouldn't give it to her, and they never mentioned her in the minutes. She's got a lawsuit pending against her. She's got actually three EEOC charges pending, and they don't give it to her. They hire this accountant, and it is not true, Your Honor, that the jury has to decide that they hired the accountant before she's better qualified. He said it's a town of 3,500. They think the better qualified a jury could find, the better qualified person, as in the Gray case, is a person who's been in the clerk's office for 10 years and knows all the people and knows how to do the job, and they added that qualification of a CPA so they would disqualify Ms. Harbert. It was up to the jury as to whether to infer that. Almost all the reasons he's given are not even things the defendant said, even the affidavit he prepared, the things, arguments he made in the brief, but as far as what they said in the minutes, if you look at when they finally hired this CPA, it's in the minutes, 617. They give no reason as to why they rejected the other person interviewed, Ms. Harbert. They just said we're hiring the lady that's a CPA. The jury could infer that they were going to hire a CPA just so they'd have somebody better qualified. In other words, here's a perfect way around a retaliation case. They can always find somebody superior to me as horrible or to any employee, so if all they've got to do is to wait until they can find somebody with superior qualifications and that'll defeat a retaliation case, then a retaliation case will never go to jury. Your Honor, in the Burdine case, a very famous Supreme Court case, the Supreme Court mentioned the value of cross-examination. A poller, CBS Inc., says trial of affidavits is not a substitute for cross-examination. We needed to ask these aldermen on cross-examination before a jury, why is it that you wouldn't go ahead and offer Ms. Harbert the job? Why is it you would not put into the minutes why you were not offering her the job? If you're having financial trouble, didn't it make you mad that you've got somebody suing the city and filed three EOC charges, the latest in October? Didn't that make you upset? Cross-examination is the essence, Your Honor, of the Seventh Amendment right to trial by jury. If we can't cross-examine the witnesses, of course we can't win the case, and you come out here and a very skilled lawyer can come up for reasons as to why, you know, why the city's decision was justified. But this ought to be left to the jury. Your Honor, the aldermen had a financial—they had a picture of interested witnesses. They're trying to look out for the city's finances. Of course they're going to be mad at somebody that's filed EEOC charges in a suit. They have a fiduciary duty to look out for city finances. If they said anything in the—if you look at the minutes, they really didn't say anything to justify the decision. But if they did, it does not have to be believed. Jury does not have to believe interested witnesses. So, Your Honor, to protect the Seventh Amendment right to a trial by jury, let us cross-examine the witnesses. And I might say this, it's a myth that summary judgment is a shortcut. It's not a shortcut. If we'd had a jury trial, the chances are we wouldn't be on this appeal, this expensive appeal. It's not a shortcut. It's a long process, and it rewards lawyers with the best writing skills. So— You know, the choir might say amen, but they still have to follow the law, Mr. Wade. Well, they do. Well, Your Honor—Your Honor, I understand. I understand that they do. But the Supreme Court has said—the lower courts, of course, draw inferences from the evidence, like this inference of this person hired them. But the Supreme Court has said inferences from the facts have to be drawn from the jury, and that is a Seventh Amendment right to have the jury draw inferences. Thank you very much, sir. Thank you, Your Honor. Thank you.